13-1298 SKG —

### AFFIDAVIT IN SUPPORT OF          13-1304 SKG
### CRIMINAL COMPLAINTS AND SEARCH WARRANTS

I, Special Agent Mark E. James of the Federal Bureau of Investigation ("FBI") being

duly sworn, state as follows:

## I.     AFFIANT AND EXPERIENCE

1.      I am an "investigative or law enforcement officer . . . of the United States" within

the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to

conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am

a duly sworn member of the FBI and have been so employed since June 27, 2004. I am currently

assigned to the Baltimore Division of the FBI in Baltimore, Maryland.

2.      I attended New Agent training at the FBI Academy in Quantico, Virginia, which

included training on drug enforcement. I also have successfully completed in-service training

courses on drug enforcement sponsored by the FBI, Drug Enforcement Administration (DEA)

and the United States Department of Justice. While employed by the FBI, I have investigated

federal criminal violations related to bank robbery, drug trafficking, firearms trafficking,

kidnapping, fugitives and public corruption.

3.      Beginning in November 2005, I was assigned to the FBI's Safe Streets Task

Force, which investigates violations of federal drug and firearms statutes. I was responsible for

investigations involving unlawful activities to include drug smuggling/trafficking, firearm

offenses and violent crime occurring in the District of Maryland.  Beginning in October 2009, I

was assigned to the Cross Border Task Force (CBTF), which consists of agents and Task Force

Officers (TFO) from the Baltimore Division and Washington Field Office of the FBI. The CBTF

investigates criminal enterprise and drug trafficking cases in Maryland and Washington, D.C. In

October 2012, I was assigned to the FBI Baltimore Public Corruption squad which is responsible

for the investigation of various corrupt public officials, including, but not limited to sworn police officers.

4.      As a Special Agent of the FBI, I have actively participated in investigations of criminal activity, including but not limited to investigations of drug trafficking. During these investigations, I have participated in the execution of search warrants and the seizure of evidence, including evidence related to drug trafficking activities and have applied for and served as the affiant for federal search warrants, arrest warrants and Title III wire intercepts. These investigations have resulted in the arrest and conviction of numerous individuals responsible for trafficking narcotics and committing violent crimes.

5.      As a Special Agent of the FBI, I also have been involved in several drug investigations and Organized Crime Drug Enforcement Task Force (OCDETF) investigations involving cocaine and phencyclidine ("PCP") trafficking organizations.

6.      With respect to drug trafficking investigations in particular, I have worked directly with confidential sources and informants to conduct controlled purchases of controlled dangerous substances. During these investigations, I have performed duties associated with electronic surveillance including, but not limited to, serving as the lead case agent, monitoring consensual telephone calls, conducting surveillance, interpreting intercepted conversations, and transcribing those same conversations.  I have listened to hundreds of intercepted communications between individuals involved in or suspected to be involved in the distribution of controlled dangerous substances. As a result of these investigations, I also have extensive experience in debriefing defendants, informants, participants and various persons directly involved in buying and distributing controlled dangerous substances and have become familiar with the language and terminology used to by those persons, the prices of controlled dangerous

substances and the packaging used to distributes these substances, and the organizational structure of enterprises that traffic in controlled dangerous substances. I also have become familiar with the use of wire and electronic communication devices by drug traffickers, the patterns of activity of drug traffickers, and the methods and language and terms that are used by drug traffickers to disguise drug trafficking and the source and nature of the profits they earn from their illegal activities. As a result of my training and experience in drug trafficking investigations, I have been qualified as an expert in U.S. District Court and testified as to the means and methods of drug trafficking and coded language.

## II.    CRIMINAL COMPLAINTS AND SEARCH WARRANTS REQUESTED

7.    This Affidavit is submitted in support of arrest warrants and criminal complaints as follows.

### Criminal Complaint for Officer Ashley Roane

8.    This Affidavit is submitted in support of a criminal complaint charging Baltimore Police Department Officer ASHLEY ROANE ("OFC. ROANE") with 1) attempted possession with intent to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 846; 2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and 3) aggravated identity theft, in violation of 18 U.S.C. § 1028A. As is described more fully below, in ¶¶ 16, 28-33, 35, 46, and 48-58, OFC. ROANE has provided assistance and protection, while serving as an on-duty sworn Baltimore Police Officer, to a Confidential Human Source ("CHS") who OFC. ROANE believes is a large-scale heroin trafficker in the Baltimore area. OFC. ROANE, while in uniform, armed with her service firearm, and in a marked BPD vehicle, provided protection while CHS conducted what OFC. ROANE believed was a narcotics transaction involving a kilogram of

wN

ρωη

heroin, and has agreed to provide such cover again in a further narcotics transaction. As is stated in ¶¶ 52-55, OFC. ROANE carried her BPD-issued service firearm while providing protection for what she believed to be a heroin transaction on April 30, 2013. 18 U.S.C. § 1028A prohibits the transfer, possession and use of a "means of identification of another person" during and in relation to certain enumerated felonies, including conspiracy and attempt to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349. Probable cause specific to this offense can be found in ¶¶ 17-27, 33-34, 36, 38-40, and 42-45.

### Criminal Complaint for Erica Hughes

9.      This Affidavit is submitted in support of a criminal complaint charging ERICA HUGHES with aggravated identity theft, in violation of 18 U.S.C. § 1028A. As is described more fully below in ¶¶ 17-27, 33-34, 36, 38-40, and 42-45, HUGHES and OFC. ROANE have provided to CHS, who HUGHES and OFC. ROANE believe also works as a tax preparer, the names, dates of birth and social security numbers of over 30 individuals for CHS to use to submit false tax returns to the IRS to obtain fraudulent tax refunds. OFC. ROANE obtains these names from law enforcement databases through her position as a BPD Officer, and she and HUGHES provide the names to CHS for use in furtherance of their conspiracy to commit wire fraud.

### Locations and Vehicles to be Searched

10.     This affidavit is submitted in support of applications to search the following locations and vehicles (collectively, the "SUBJECT LOCATIONS")"

a.      **3924 Squire Tuck Way, Pikesville, Maryland, 21208,** described as a two story townhouse with a white storm door and a white front door with glass in the center, and with the numbers 3924 are affixed to the door frame above the door, and blue/grey shutters on the windows. Probable cause specific to this location may be found in ¶¶ 13, 23, 26-28, 42 and 44.

b.      **OFC. ROANE's BPD-issued locker located at the Baltimore Police Southwest District Headquarters, 424 Font Hill Avenue, Baltimore,**

**Maryland 21223**. The specific locker assigned to OFC. ROANE will be identified as described in ¶¶ 61-62 and the search of the locker will be expressly conditioned on the conditions precedent in ¶¶ 61-62. Probable cause specific to this location may be found in ¶¶ 17, 22, 25, 28 and 35.

      b.    **2009 Honda 2 door bearing Maryland registration 88225CC.** Probable cause specific to this vehicle may be found in ¶¶ 14 and 42-44.

      c.    **Cellular telephone with call number (443) 562-1992**, subscribed to Erica Hughes at 3924 Squire Tuck Way, Pikeville, Maryland, with service provided by AT&T and used by OFC. ROANE. Probable cause specific to this telephone may be found in ¶¶ 14, 19, 29-30, 33, 36-37, 48-52 and 56.

      d.    **Cellular telephone with call number (443) 846-2006**, subscribed to Erica Hughes at 3924 Squire Tuck Way, Pikeville, Maryland, with service provided by AT&T and used by HUGHES. Probable cause specific to this telephone may be found in ¶¶ 15, 18-19, 21 and 25.

11.    I submit that there is probable cause to believe that within the SUBJECT LOCATIONS, there is evidence of the following crimes: bribery, in violation of 18 U.S.C. § 201; possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); aggravated identity theft, in violation of 18 U.S.C. § 1028A; conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349; interference with commerce through extortion, in violation of 18 U.S.C. § 1951; and attempted possession with intent to distribute controlled substances, in violation of 21 U.S.C. §841, 846 (collectively, the "SUBJECT OFFENSES").

12.    I am familiar with all aspects of the investigation, and have included facts sufficient to establish probable cause, but have not included all facts which are pertinent to the investigation. I have not excluded any facts which would defeat a finding of probable cause.

### III.   **PROBABLE CAUSE**

<u>Initial Debrief of CHS Regarding OFC. ROANE and HUGHES</u>

13.     On February 26, 2013, a confidential human source ("CHS") provided information regarding alleged criminal activity being conducted by Baltimore Police Officer Ashley ROANE ("OFC. ROANE") and her roommate, Erica HUGHES ("HUGHES"). CHS reported that OFC. ROANE and HUGHES live together in a townhome at **3924 Squire Tuck Way, Pikeville, Maryland**.    CHS identified both OFC. ROANE and HUGHES through photographs which were later verified by law enforcement through Maryland Vehicle Administration driver's license photographs.

14.     According to CHS and checks of BPD records, OFC. ROANE is an active duty uniformed Baltimore Police Officer assigned to patrol the Southwest District of Baltimore City. According to CHS, OFC. ROANE owns and drives a **2009 Honda 2 door bearing Maryland registration 88225CC** (the "**2009 Honda**") and is the user of cellular telephone number **(443) 562-1992**.

15.     According to CHS, HUGHES has been self-employed for some time, but may now be employed in a new job. HUGHES is the user of cellular telephone number **(443) 846-2006**.  According to CHS, HUGHES owns and drives a red Audi Q7 SUV.

16.     CHS stated that in the fall 2012, OFC. ROANE spoke with CHS regarding his/her drug trafficking. OFC. ROANE told CHS that if he/she wanted to sell drugs in the area where she patrols then she, OFC. ROANE, would provide CHS with a location that is not heavily concentrated with police for him/her to sell drugs. Additionally, OFC. ROANE stated that she could provide CHS with current information in regards to police activity, specifically executions of drug search and seizure warrants that were going to take place.

### A.     The Identity Theft and Wire Fraud Scheme

PMN

17.     CHS said that prior to the February 26 debriefing, specifically on February 18, 2013, HUGHES met with CHS to discuss a money making venture for CHS, HUGHES, and OFC. ROANE.  During this meeting, HUGHES provided CHS with a handwritten list of ten female names and corresponding social security numbers and dates of birth, which CHS then provided to law enforcement. HUGHES stated she obtained the list from OFC. ROANE. According to HUGHES, OFC. ROANE obtained twenty female names, social security numbers, and their dates of birth from a Baltimore Police Department computer system.  OFC. ROANE then provided HUGHES with the handwritten list of ten of those names.  HUGHES asked CHS, who OFC. ROANE and HUGHES believed works at a tax preparation service in Baltimore, to check the names and see if they had filed tax returns for 2012.  If they had not submitted tax returns, HUGHES wanted CHS to file false returns in their names and once CHS received the refund, split the profit between CHS, HUGHES, and OFC. ROANE. To avoid constant pressure from HUGHES regarding the submission of the names, CHS later falsely advised HUGHES that six of the names were "no good" – meaning that those individuals had already filed federal income tax returns but he/she was waiting on verification on the remaining four names.  A subsequent review of the ten names and identifiers was conducted by law enforcement and each name was found in law enforcement databases, and therefore each of the ten sets of name, social security number and date of birth belonged to a natural person.

### March 7

18.     On March 7, 2013, CHS was debriefed regarding the current activities of OFC. ROANE and HUGHES. CHS reported that HUGHES had been texting and calling CHS, using cellular telephone number **(443) 846-2006,**  regarding the list of names that she and OFC. ROANE had supplied to CHS for the false tax returns. CHS stated that within the past few days

he/she advised HUGHES, at the direction of law enforcement, that of the last four names checked by CHS, only one name was able to be used for a return.

19.     On March 7, 2013, CHS, at the direction of law enforcement, placed a consensually recorded telephone call to HUGHES at **(443) 846-2006**. During the call CHS informed HUGHES that on Monday, March 11, 2013, CHS should have the refund from the remaining name submitted by CHS. During the course of the conversation HUGHES placed OFC. ROANE on the phone with CHS. After a brief conversation, OFC. ROANE provided CHS with cellular telephone number **(443) 562-1992** as her contact number.

March 13 - Controlled Payment to OFC. ROANE and HUGHES

20.     On March 13, 2013, FBI TFOs William Nickoles and Chad Ellis and FBI SA Mark James met with CHS to conduct a controlled payment for of the purported fraudulent income tax refund to OFC. ROANE and her associate HUGHES. The following events and debriefing resulted in the meeting.

21.     Prior to the meeting, CHS was briefed by law enforcement and provided $1,250.00 in official government funds to provide to OFC. ROANE and HUGHES as the fraudulently obtained tax refund. CHS placed a consensually recorded telephone call to Erica HUGHES at **(443) 846-2006**. During the conversation CHS advised he/she was five minutes away from meeting with HUGHES and OFC. ROANE. CHS drove to **3924 Squire Tuck Way, Pikeville, Maryland**, the residence of OFC. ROANE and HUGHES and entered the dwelling. CHS was inside of the residence for a short time, and then exited and proceeded to the prearranged meet location with the law enforcement officers.   CHS then turned over a handwritten list of ten names, dates of birth, and social security numbers.

PMN

22.     CHS was debriefed regarding the events surrounding the controlled payment. CHS said that OFC. ROANE spoke with CHS but then went up to the second floor of the residence. CHS provided HUGHES the $1250.00 of OGF and requested the additional list of ten names, previously described by HUGHES and obtained by OFC. ROANE.  HUGHES then went upstairs and spoke with OFC. ROANE. HUGHES returned with a small pocket sized notebook commonly used by Baltimore Police Officers.  In front of CHS, HUGHES copied from the book 10 additional names, dates of birth and social security numbers. CHS asked for a list of male's names even those that may be incarcerated. HUGHES advised that OFC. ROANE gets off of work at the Baltimore Police Department at 4:00 tomorrow (March 14, 2013) and would have the new list.  CHS said that during the meeting OFC. ROANE was standing at the top of the steps on the second floor listening to the conversation.

<u>March 14</u>

23.     On March 14, 2013, TFO Nickoles and SA James met with CHS to conduct an in-person meeting with OFC. ROANE and HUGHES regarding the filing of more fraudulent tax returns. CHS arrived and parked near the target residence, **3924 Squire Tuck Way, Pikesville, Maryland**, and went inside.  A short time later, CHS departed the area followed by investigators.  Approximately one minute later, investigators observed OFC. ROANE and HUGHES departing the area in HUGHES' red Audi Q7 SUV.

24.     At approximately 4:32 p.m., CHS arrived at the neutral location and was debriefed.  CHS reported that upon arrival at the residence, OFC. ROANE was on the second floor of the house as HUGHES met CHS on the first floor.  OFC. ROANE came down stairs as CHS was about to leave.  CHS told HUGHES the list of names given to CHS on March 13, 2013, could not be used to file tax returns.  HUGHES said that OFC. ROANE had reported that

it was a busy day at work and was unable to obtain a list of male names. However, HUGHES stated that OFC. ROANE would attempt to gain the names the following day. HUGHES told CHS that she thinks OFC. ROANE can obtain juveniles names but was unsure if the records showed their social security numbers.

March 15

25.     On March 15, 2013, at approximately 11:06 a.m., CHS telephoned TFO Nickoles and reported that minutes earlier he/she had a telephone conversation with Erica HUGHES over **(443) 846-2006**. Law enforcement was not in a position to record the conversation due to the timing of the call. CHS stated that after speaking with HUGHES about personal matters, HUGHES brought up the matter of obtaining identification information that could be used to file fraudulent tax returns. HUGHES said that they (HUGHES and OFC. ROANE) had obtained the personal information of four males so far today. OFC. ROANE was attempting to gain additional male names before she left work.

March 19

26.     On March 19, 2013, CHS met with investigators to conduct an in-person consensually recorded meeting with OFC. ROANE and HUGHES. The meeting was conducted so that CHS could obtain additional information from OFC. ROANE and HUGHES regarding their involvement in the tax fraud scheme. CHS met with investigators at a neutral location and then drove to the residence of OFC. ROANE and HUGHES located at **3924 Squire Tuck Way, Pikesville, Maryland** and went inside. A short time later, CHS exited the dwelling and departed the area followed by investigators.

27.     CHS arrived at the neutral location and provided investigators with a list of four male names with dates of birth and social security numbers. CHS was then debriefed as to

PMN .

his/her interaction with OFC. ROANE and HUGHES. The list of names was generated by HUGHES after OFC. ROANE provided her with what appeared to CHS to be an index card with the names and identifying information written on it.  OFC. ROANE stated that she had not been at work so she only had the four names to provide for CHS to submit.  CHS told OFC. ROANE that he/she could combine the female's names provided by HUGHES and OFC. ROANE on March 13, 2013 with these new male names, so as to make it appear they were married on the tax returns.  CHS told OFC. ROANE and HUGHES that combining the names in this manner could result in a larger tax refund.

**B.      OFC. ROANE Offers to Use Her Position as a Police Officer to Assist CHS in Drug Trafficking**

28.      On March 19, CHS also asked OFC. ROANE if she could conduct a criminal check one of CHS's associates in his/her drug-related business.  Specifically, CHS told law enforcement that he/she told OFC. ROANE, "I have a guy to get checked out before my homeboys fuck with him."  CHS stated that OFC. ROANE stated she could check to see if the name is on anyone's "paperwork."  Based on my training and experience, OFC. ROANE was telling CHS that she could conduct unauthorized checks of law enforcement databases, witness lists and probable cause statements, and to see if a person who CHS was considering engaging in a drug transaction with was an informant with the Baltimore Police Department.  If the person is an informant or cooperator with the BPD, OFC. ROANE could then advise CHS not to engage in a drug transaction with the person.

<u>March 28</u>

29.      On March 28, 2013, investigators met with CHS to conduct an in-person meeting with OFC. ROANE. The purpose of the meeting was to obtain additional information regarding OFC. ROANE's desire to file fraudulent tax returns and conduct unauthorized criminal inquires

PMN.

on an individual who OFC. ROANE believed to be conducting criminal activity with CHS. CHS met with investigators who provided the name and date of birth of a fictitious identity ("Individual A") made up by law enforcement agents for CHS to supply to OFC. ROANE as the individual who CHS was planning to engage in a drug transaction. CHS placed a consensually recorded telephone call to OFC. ROANE at telephone number **(443) 562-1992** as witnessed by investigators. OFC. ROANE answered the call and agreed to meet CHS in 10-15 minutes at Shoe City located in the Westside Shopping Center near Frederick Avenue in Baltimore.

30.     CHS departed the neutral location followed by investigators. Shortly thereafter, CHS telephoned TFO Nickoles and advised that he/she had received a telephone call from OFC. ROANE. CHS said OFC. ROANE told him/her to meet her in the 3100 block of Frederick Avenue. CHS then telephoned TFO Nickoles and said he/she had received a second call from OFC. ROANE telling CHS that she was near the Three Brothers restaurant located at 3061 Frederick Avenue, Baltimore, Maryland.

31.     TFO Ellis located a marked Baltimore Police Department patrol car parked on the parking lot located at 3061 Frederick Avenue. Upon locating the patrol car, it exited the lot. CHS departed the Westside Shopping Center and traveled toward the 3100 block of Frederick Avenue followed by Nickoles.

32.     CHS telephoned TFO Nickoles and advised that OFC. ROANE had called again and instructed CHS to follow her. At the time of the call TFO Nickoles observed CHS pull to the curb in the 3100 block of Frederick Avenue at which time a marked BPD patrol car occupied by OFC. ROANE and a male BPD officer pulled to the curb on the opposite side of the street across from CHS. The patrol car turned into the 400 block of South Longwood Street followed by CHS. Both vehicles pulled to the curb and parked. CHS and OFC. ROANE were observed by

investigators standing on the sidewalk talking. The male police officer stayed in the patrol car during the meeting.

33. After a short time, the meeting concluded. Both vehicles then left the area. CHS was followed back to the neutral location. CHS arrived at the neutral location, turned over the recording devices, and provided the following information regarding the meeting with OFC. ROANE. Prior to arriving at the neutral location, OFC. ROANE, using **(443) 562-1992**, telephoned CHS and said she had had just spoken with HUGHES after their meeting and explained that she, OFC. ROANE had just met with CHS. HUGHES was upset and didn't want CHS and OFC. ROANE to meet. OFC. ROANE told HUGHES she was checking a name for CHS (a reference to running he name in the BPD databases) and HUGHES asked if she was getting paid for that. OFC. ROANE told HUGHES that CHS was going to "take care of her" (a reference to compensating OFC. ROANE for checking the name). During the meeting, OFC. ROANE explained that she did not receive any money from HUGHES from the last tax refund payment provided by CHS. OFC. ROANE told CHS that she had asked HUGHES about the money from the tax refund and was offered fifty dollars which OFC. ROANE told HUGHES to keep. OFC. ROANE said she wanted to call CHS on her own and not go through HUGHES when dealing with the tax refunds.

34. CHS provided OFC. ROANE with the name and date of birth written down by CHS which was provided to CHS by law enforcement. OFC. ROANE said she would check the name today and see if it is "good" - a reference to whether CHS should conduct criminal business with the person. OFC. ROANE said she would obtain additional names for tax returns including names of children. CHS said the tax refund from the last list of names provided by OFC. ROANE will be available next week. OFC. ROANE told CHS to give the money to

HUGHES, but that after that payment, OFC. ROANE and CHS would deal together directly and not include HUGHES for the false next tax return. OFC. ROANE explained that she has a pre-paid phone that they can communicate on since HUGHES can check the cellular records of the line she had using to speak to CHS. According to OFC. ROANE, using the other telephone would allow them to talk without being discovered by HUGHES.

April 1

35.    On April 1, 2013, CHS telephoned and reported an unexpected encounter with OFC. ROANE on March 31, 2013. CHS said that on March 31, 2013, at approximately 5:00 p.m., he/she attended a holiday celebration and ran into OFC. ROANE and HUGHES. OFC. ROANE told CHS that Individual A was "clean" in that there was nothing on him, indicating that the person did not appear to be working with the BPD. OFC. ROANE said it looked as if Individual A had never been arrested. OFC. ROANE went on to explain that she was unable to locate the pre-paid cellular telephone OFC. ROANE previously spoke of using to communicate with CHS. CHS advised that he/she may be able to obtain a pre-paid telephone for OFC. ROANE to use.

April 4, 2013 – OFC. ROANE Agrees to Protect CHS During a Drug Deal

36.    On April 4, 2013, CHS met with investigators to conduct a consensually recorded fraudulent tax refund payment to Baltimore Police Officer Ashley OFC. ROANE. CHS met with investigators and was briefed regarding the controlled payment. CHS placed a consensually recorded telephone call to OFC. ROANE at **(443) 562-1992** and during the conversation OFC. ROANE advised that she would meet CHS to pick up the tax refund in ten minutes at the same place they met for their last meeting (400 block of South Longwood Street).

PMN

37.     CHS then received an incoming telephone call from OFC. ROANE, using telephone number **(443) 562-1992**, who advised she would travel to CHS's location if needed. The two agreed to keep the original meet location in the 400 block of South Longwood Street.  CHS was provided $2,500 in official government funds.  CHS then departed the neutral location followed by TFO Nickoles.  CHS arrived in the 400 block of south Longwood Street and parked.  Prior to his/her arrival, SA James and TFO Ellis established surveillance in the block.

38.     Shortly after CHS's arrival, a marked Baltimore Police Department vehicle (#129082) pulled into the block with CHS and parked.  The vehicle was driven by another BPD Officer (the same Officer who was with OFC. ROANE on March 28, 2103) and OFC. ROANE was in the front passenger.  OFC. ROANE exited the vehicle and met with CHS on the sidewalk. The two then engaged in conversation.  During the conversation, OFC. ROANE answered her police radio.  After a short conversation, OFC. ROANE and CHS each entered their vehicles and departed the area.  CHS arrived at the neutral location followed by TFO Nickoles.

39.     CHS asked if OFC. ROANE would watch over him/her while he/she did a heroin deal with Individual A here in Baltimore, and OFC. ROANE agreed.  OFC. ROANE explained that CHS should conduct the transaction at the Westside Shopping Center where it is busy.  OFC. ROANE explained that she would like to do it while she is working.  She explained that she would sit in her patrol car by a nearby restaurant with her head down and act as if she was writing a report while CHS and Individual A did their drug deal in the middle of the parking lot. OFC. ROANE would let CHS know prior to the deal whether it was a good or bad time to conduct the transaction.  OFC. ROANE went on to explain that another drug trafficker with whom she is acquainted uses parking lots in this manner to conduct his drug deals.

PMN

Case 1:13-mj-01302-SKG Document 2 Filed 05/28/13 Page 16 of 26

40.     CHS told OFC. ROANE that the fraudulent tax refund money was in his/her vehicle. OFC. ROANE entered CHS'S vehicle and retrieved the white envelope containing $2,500 in OGF which she placed in her pocket. OFC. ROANE told CHS to tell HUGHES that the refund was only $2,000 not $2,500 because OFC. ROANE was going to keep $500 and not tell HUGHES. OFC. ROANE advised she had ten additional names she had hidden from HUGHES in her uniform shirt at home. She would give them to CHS tomorrow, (April 5, 2013) and asked if she could receive a refund by May 1, 2013.

April 9

41.     On April 9, 2013, CHS met with investigators to conduct an in-person consensually recorded meeting with OFC. ROANE. The purpose of the meeting was for CHS to obtain ten names with dates of birth and social security numbers from OFC. ROANE for the purpose of filing fraudulent tax returns.   CHS met with investigators and was briefed. CHS placed consensual telephone calls to OFC. ROANE at (443) 562-1992 which went unanswered. Prior to the meeting TFO Ellis established surveillance in the area **3924 Squire Tuck Way**. Parked in front of the location was OFC. ROANE's **2009 Honda 2 door bearing Maryland registration 88225CC**.

42.     CHS departed the neutral location followed by TFO Nickoles, and drove to **3924 Squire Tuck Way**. CHS knocked on the front door of the residence, and shortly thereafter, waved to an individual at the window on the second floor of the house. A few moments later, the front door opened and CHS went inside. A short time later, CHS and a black female, later identified as OFC. ROANE, exited the front door and walked toward the lot where OFC. ROANE's vehicle, the **2009 Honda,** was parked.   After the conversation ended, OFC. ROANE

Page 16 of 26

PmN

walked back into the residence as CHS entered his/her vehicle and left the area followed by Nickoles.

43.    CHS arrived at the neutral location and turned over a handwritten list of ten male names with dates of birth and social security numbers. CHS was debriefed as to his/her interaction with OFC. ROANE and provided the following information. OFC. ROANE heard CHS knocking and spoke with him/her from the second floor window. OFC. ROANE did not realize CHS had called her since she had her phone on silent. OFC. ROANE advised that she is working the three to eleven shift. CHS advised that once CHS arrived OFC. ROANE walked with him/her to OFC. ROANE's vehicle, the **2009 Honda**. OFC. ROANE retrieved a handwritten piece of paper containing ten male names with dates of birth and social security numbers from the **2009 Honda** and gave it to CHS. OFC. ROANE asked if CHS would have a refund for her soon because she needed money. CHS told OFC. ROANE that he/she will need her (a reference to providing protection during a drug transaction) possibly this week or next. OFC. ROANE said she will do whatever CHS wants. CHS told OFC. ROANE that he/she would look out for her (a reference to paying OFC. ROANE money for protecting CHS while engaged in a drug transaction).

<u>April 24</u>

44.    On April 24, 2013, CHS met with investigators to conduct an in person consensually recorded tax fraud scheme payment of $1,500 to OFC. ROANE. The payment was a follow up to an April 9, 2013 consensually recorded meeting in which OFC. ROANE provided CHS with a list of ten names with dates of birth and social security numbers for the purpose of filing fraudulent tax returns. CHS met with investigators and was briefed. During the briefing, CHS advised that prior to meeting with law enforcement he/she had received one text message

ρɯๅ

and one telephone call from OFC. ROANE.  During these communications, OFC. ROANE said

that she was in Ellicott City and wanted to meet CHS at the Wal Mart on route 40.  OFC.

ROANE then agreed to meet CHS at her residence and not Wal Mart.  OFC. ROANE followed

up the communication by advising she had arrived at her residence. CHS was then provided with

$1,500 in official government funds.  CHS then departed the neutral location followed by

investigators and traveled to OFC. ROANE's residence located at **3924 Squire Tuck Way** and

parked.  Upon arrival investigators observed OFC. ROANE's vehicle, the **2009 Honda**, parked in

front of her dwelling.

45.     CHS was observed standing near OFC. ROANE's vehicle speaking with a black

female wearing a tan colored bandana and white t-shirt later identified as OFC. ROANE.  OFC.

ROANE and CHS ended their meeting and departed the area.  CHS returned to the neutral

location, and was debriefed as to the interaction with OFC. ROANE. CHS reported that during

the meeting OFC. ROANE expressed her displeasure at only receiving $1,500 from CHS. She

thought she would have received $3,000. OFC. ROANE stated that she was preparing for next

tax season and wanted to provide CHS with the names earlier in the tax season. She went on to

say that she was driving back to Wal Mart to meet her sister and then would be using the money

to pay her traffic tickets.

46.     In addition to discussing the tax fraud scheme CHS told OFC. ROANE that

he/she would possibly need her help with "the boy" (a reference to conducting a drug related

meeting) in the upcoming week. OFC. ROANE advised that she was still working evenings next

week and would be able to assist CHS during the meeting.

April 30 – OFC. ROANE Provides Protection to CHS During What She Believes is a Drug
Transaction.

47.     On April 30, 2013, CHS met with investigators to conduct a controlled and consensually recorded drug transaction and follow up payment with OFC. ROANE. The meetings occurred at the Westside Shopping Center located at 2413 Frederick Avenue, Baltimore, Maryland and the 400 block of South Longwood Street, Baltimore, Maryland.

48.     CHS contacted OFC. ROANE on her telephone number, **(443) 562-1992**, and explained that CHS planned to meet Individual A, the drug trafficker they had discussed earlier, to conduct a drug transaction on April 30, 2013 and would need OFC. ROANE's assistance during that transaction. CHS told OFC. ROANE to look for a brown Ford Explorer bearing Maryland registration 810M958, which would be in the parking lot of the Westside Shopping Center. CHS told OFC. ROANE that he would pay her for her assistance. OFC. ROANE followed up by sending a text message to CHS which said: "Ok sound good."

49.     After the above communication with OFC. ROANE, law enforcement established surveillance on the parking lot of the Westside Shopping Center, Baltimore, Maryland. Law enforcement parked a brown Ford Explorer bearing Maryland registration 810M958, which would be used during the operation as the vehicle that Individual A was ostensibly using to drop the heroin off to CHS.     TFO Nickoles placed a blue backpack containing a brick-shaped package of white powder wrapped in tan tape which resembled a kilogram of heroin into the rear hatch area of the brown Ford Explorer. No other items were in the vehicle.

50.     CHS met with TFO Nickoles and SA James at a neutral location and CHS was briefed as to the operation. CHS placed two controlled telephone calls to OFC. ROANE at **(443) 562-1992**, but both went unanswered. A few minutes later, CHS received an incoming telephone call from OFC. ROANE, using **(443) 562-1992**. During the call, CHS told OFC. ROANE he/she was meeting with his/her "guy" (drug supplier) which OFC. ROANE acknowledged.

51.     A short time later, CHS placed an outgoing consensually recorded telephone call to OFC. ROANE at **(443) 562-1992**. During a portion of the conversation, CHS asked OFC. ROANE to verify that a brown Ford Explorer bearing Maryland registration 810M958 was parked on the Westside Shopping Center lot. This vehicle was placed in the shopping center by law enforcement. A short time later, CHS placed a consensually recorded telephone call to OFC. ROANE at **(443) 562-1992**. During the conversation, OFC. ROANE advised CHS that it may take her 20 minutes before she can check the Westside Shopping Center parking lot for the Explorer.

52.     A short time later, CHS received an incoming consensually recorded telephone call from OFC. ROANE, using **(443) 562-1992**. OFC. ROANE reported that the vehicle was on the lot. At this same time, a marked BPD vehicle bearing shop number 098904 entered the Westside Shopping Center lot. The marked BPD vehicle (#098904) parked in a parking space behind the UC vehicle. The marked BPD vehicle (#098904) was facing south with a direct line of sight to the brown Ford Explorer vehicle. A black female officer in uniform was observed in the driver's seat. A black female passenger, wearing plain clothes and a yellow baseball style hat was seen in the front passenger seat.

53.     CHS was provided with $500 in official government funds and departed the neutral location followed by TFO Nickoles and SA James. Approximately 10 minutes later, CHS entered the Westside Shopping Center parking lot and parked behind the brown Ford Explorer. CHS opened the rear hatch of the Explorer and retrieved the package from inside of the rear hatch of the Explorer. TFO Nickoles and SA James observed the package retrieved by CHS to be a blue backpack, the same backpack placed there by TFO Nickoles. CHS entered his/her vehicle with the blue backpack and drove off the lot, heading westbound on Frederick

Avenue.  The marked BPD vehicle (#098904) drove out of the parking space and exited the lot through the Citgo gas station.

54.    Approximately 5 minutes later, CHS arrived at the 400 block of South Longwood Street, the previously arranged location for CHS and OFC. ROANE to meet.  A few minutes after CHS's arrival, OFC. ROANE, who was now alone in her vehicle, arrived in a marked BPD vehicle bearing shop number 79148 and met with CHS. CHS and OFC. ROANE hugged, engaged in conversation and CHS handed OFC. ROANE $500.00 in official government funds for providing protection during the drug delivery.   OFC. ROANE was observed to be in her standard issue BPD uniform and was on-duty at this time.  I know from my training and experience that BPD General Orders require officers to carry their service firearms with them while on duty.  Furthermore, surveillance units observed what appeared to be a firearm in OFC. ROANE's holster on her hip.

55.    After OFC. ROANE departed, CHS was debriefed as to his/her interactions with OFC. ROANE and reported the following. OFC. ROANE acknowledged that she saw CHS retrieve the bag. CHS handed OFC. ROANE the $500.00 in official government funds. OFC. ROANE also told CHS she changed vehicles before meeting CHS.

56.    On April 30, 2013, CHS sent a monitored text message to Baltimore Police Officer Ashley OFC. ROANE at **(443) 562-1992**. The text was a follow up to their earlier interaction during a drug transaction and controlled payment. The following is the content of the text message.

CHS:          Wassup lady dat my bag was real good it's was
              a fucking whole boy for 60k thanks boo the time
              hope u can start helping me more and I will
              bless ur pocket

              So we cool

OFC. ROANE:    awesome....Yup

57.     Based on my training and experience investigating drug trafficking in the Baltimore area, I know that when CHS used the term "a whole fucking boy" he was referring to a kilogram quantity of narcotics, and that this terminology would be familiar to an Officer such as OFC. ROANE, who is also experienced in investigating Baltimore drug trafficking. Furthermore, I know that the price of "60k" quoted by CHS is consistent with a kilogram of heroin, and not with any other drug commonly sold in the Baltimore area.  I further believe that OFC. ROANE would also be familiar with this price as consistent with heroin.

May 27, 2013

58.     On May 27, 2013, CHS contacted OFC. ROANE by text message at the direction of law enforcement and informed OFC. ROANE that he/she had planned another drug transaction for May 28, 2013, and asked whether OFC. ROANE could cover him again.  OFC. ROANE stated that she was working on Tuesday, May 28, 2013 until 3:00pm, and therefore would be available to cover him/her.  Law enforcement plans to conduct another controlled transaction, which OFC. ROANE believes to be a one-kilogram heroin transaction, on May 28, with OFC. ROANE providing cover.

IV.    <strong>CONCLUSION</strong>

59.     Based on the information set forth in this affidavit, I believe that sufficient probable cause exists to believe that in SUBJECT LOCATIONS, there is evidence of the SUBJECT OFFENSES.

60.     In addition, due to the use of the specific cellular telephones listed in the SUBJECT LOCATIONS to further the charges crimes, and my knowledge, training and experience, I seek permission to search the two specific cellular telephones, **(443) 846-2006 and (443) 652-1992,** for recent calls, contacts, address books, text messages, voicemail messages,

email, photographs and other forms of communication according to the protocol on Attachment B. I know in my experience as a FBI Special Agent that this information is often only temporarily stored in cellular telephones, and that there exist technologies whereby a remote user can delete information sought by law enforcement from a cellular telephone.

61.     I have learned that officers of the Baltimore Police are assigned a specific locker at their home District. However, I was unable to ascertain which locker is assigned to OFC. ROANE because the other investigating agents and I, believed that to inquire as to OFC. ROANE's locker prior to execution of the warrants would disclose the existence of the investigation.

62.     Authorization to search OFC. ROANE's locker at 424 Font Hill Avenue, Baltimore, Maryland 21223, the Baltimore Police Southwest District, is conditioned on the following condition being fulfilled at the time of the search: investigating agents will inquire of the most senior officer on duty as to the location of OFC. ROANE's locker; once the agents are directed to the locker, it will be searched. If the officers on duty are unable to do so, the warrant for OFC. ROANE's locker at 424 Font Hill Avenue, Baltimore, Maryland 21223 will not be executed.

WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue criminal complaints charging OFC. ROANE and HUGHES as requested above, and search warrants for the SUBJECT LOCATIONS for the items listed on Attachment A, which constitute fruits, evidence and instrumentalities of the SUBJECT OFFENSES.


_____
Special Agent Mark James
Federal Bureau of Investigation


Sworn to before me this 28 day of May 2013 at 9:45 hours.

_____
The Honorable Susan K. Gauvey
United States Magistrate Judge

## ATTACHMENT A

### Items to be Seized

The SUBJECT LOCATIONS shall be searched for:

1. Books, records, computers, personal digital assistants, cell phones, flash media, which may reflect names, addresses and/or telephone numbers of their associates with drug trafficking organizations;

    a. This shall include the cellular telephones with call numbers **(443) 562-1992 and (443) 846-2006 (the "subject electronic devices");**

2. Photographs;

3. Records of financial transactions, including bank deposit slips, bank accounts, check ledgers and bank cards;

4. All books, records, bank statements, canceled checks, deposit tickets, financial statements, correspondence and other pertinent documents furnished by or on behalf of the listed individuals indicating the individuals might have a financial interest;

5. Documents related to use of professional or private money transmitters that reflect the transfer of money on behalf or to a known member of the organization or a listed individual;

6. Documents that refer or relate in any way to financial institutions, investment or bank accounts, and credit/debit card accounts;

7. Documents that refer or relate in any way to assets such as but not limited to vehicles, real estate, precious metals, etc purchased by or on behalf of the listed individuals;

8. Currency or currency equivalents.

9. Firearms and ammunition.

PMN

**ATTACHMENT B**

This warrant authorizes the search for electronically stored information as described in Attachment A.

Because of the possibility that the electronically stored information in the subject electronic devices on Attachment A may include information that is beyond the scope of the information for which there is probable cause to search, the search shall be conducted in a manner designed to minimize to the greatest extent possible the likelihood that files or other information for which there is not probable cause to search is not viewed. While this protocol does not prescribe the specific search protocol to be used by the Federal Bureau of Investigation ("FBI") it does contain limitations to what they may view during their search, and the agents shall be obligated to document the search methodology used in the event that there is a subsequent challenge to the search that was conducted pursuant to the following protocol:

With respect to the search of any digitally/electronically stored information that is seized pursuant to this warrant, and described in Attachment A hereto, the search procedure shall include such reasonably available techniques designed to minimize the chance that investigators conducting the search will view information that is beyond the scope for which probable cause exists. The following list of techniques is a non-exclusive list which illustrates the types of search methodology that may avoid an overbroad search, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein:

1.   Use of computer search methodology to conduct an examination of the electronically stored information contained in the subject electronic devices to determine whether that data falls within the items to be seized as set forth herein by specific date ranges, names of individuals, or organizations;

2.   Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

3.   Physical examination of the storage device, including digitally surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein.